Appellant, Mr. Atkins for the Appellant, Mr. Ewing for the Accolade. May it please the Court, Counsel. Good morning. Tony Axum, representing the Appellant, Mr. Harold Dorman. I'd like to reserve two minutes for rebuttal. The evidence in this case was insufficient to establish that Mr. Dorman constructively possessed everything inside the address that was searched, 2317 Chester Street, or everything in specific locations at that address. He was not the owner or the lessee. He did not live there, though he stayed there often. He was not present when police found contraband inside the premises. And even though we weren't allowed to develop further, there were many people that had access to the house and access to the bedroom. To show constructive possession, the government was required to show both Mr. Dorman's knowledge and his ability to exercise dominion and control over the items recovered from the house. The government failed to show Mr. Dorman's knowledge of any of the items in the house, and specifically the PCP that was recovered in common areas of the house, hidden in common areas of the house, the gun that was hidden in the couch, and the bullets hidden in the bin in the bedroom associated with him, and the gun that was found in the, between the mattress and that. I would agree with you in the order that you put the gun between the mattress and the box spring. Isn't there evidence on which a reasonable jury could find beyond reasonable doubt that Mr. Dorman was the primary occupant of that room, that it was his room, and that he had slept there the night before, and that there's enough indicia given that he slept on that bed and that gun was poking out between those to the bed that he had constructive possession over that gun? You know it's a very deferential standard on appeal. It's correct that that's the most difficult piece of evidence, but the government still has failed to show knowledge, and I'm not, I disagree that the evidence showed that he slept there the night before. His mother testified that the last time she had seen him was six or seven. She said she woke up at 6 a.m. that morning and left for work. No one had seen him at the house. There's no testimony that he was there, and his mother's testimony was that he did not live there, that he stayed there, that he stayed there with some frequency. I know that she referred to it as his home base, but remember Mr. Dorman had one of the only two keys to the bedroom. Wasn't that in the evidence? There were two keys to the bedroom, but she also testified that the bedroom was never locked. In fact, the pictures depict the bedroom door open and propped open with items in front of it. She also testified that she had brought many items to the basement because she had been doing renovations, and again everyone in the house had access to the bedroom. There was no restriction on where people could go or sleep or stay or hide things. So there's still lacking evidence that he knew that he placed it there. We don't know when the gun or the bullets were placed in that bedroom. I said his mother testified he was the only person who slept in that room. That was his room? I know that she referred to it as his room, and we don't dispute that he's the primary occupant of the room, but with other people having access to the room, he certainly didn't have exclusive control over the room. Again, there's no evidence. We don't know when. There's no evidence that he was the only person who slept in that room. The officer also testified that although you could see the handle sticking out, they took a picture of that, in order to know that there was a gun there, they had to lift the mattress. So it's not something that, although part of it was sticking out, was immediately apparent to anyone. Without evidence as to when it was placed there, when he was last there, and with evidence that many people have access to it, the government is still lacking. Just to be clear there, what evidence was there? Because I know there was evidence that lots of people were using the laundry room. Was there evidence that other people were going into the bedroom? No. There was no evidence that people were going into the bedroom, but no one was excluded from the bedroom. No one was excluded from any place. The mother testified that there were things in the bedroom that she didn't recognize. What's obvious is that, again, we weren't allowed to develop who else had access to the house, the number of people. We do know that Harold Dorman Sr., Cleveland Hill, Cleveland Hill let two people into the house at one point. We know that there was Seth Jr., Seth Sr., and Mrs. Jennings herself. She had access. She had ownership of the entire house. In that sense, she had just as much knowledge. If he has knowledge, she had just as much knowledge. I'm thinking of our cases, Dykes and Edelen, which involved someone who was the sole occupant of a bedroom. I don't think we required there, in order to support an inference of awareness of the items in the room, that the room be consistently locked against all of their comers, but just that it be the person's room that wasn't also actively shared by others. As I read the testimony here, Mrs. Jennings did testify that this was his room. He cleaned it. He and his girlfriend were the ones that cleaned it when it was cleaned. There's no testimony that others were in and out of there. In contradistinction, I think, as you point out, to the testimony that there were several other individuals using the home generally. I take the Court's point, but I think that it's actually opposite sides of the same coin. The Court's saying that there was no evidence that other people shared it, and I'm saying the government had to show that he exclusively controlled it. We do know that he was not in exclusive control of the room. With that uncertainty comes what I'm saying, not knowing when the gun is there, not knowing when he was last there, not having him present. He was there. I thought his mother testified he was there the night before when she went to sleep. At 6 or 7, he was there. So we do know when he was last there, at least, that he was there within 24 hours of the search. That's correct, but we don't know when the gun appeared there. Could you address the bottle by the laundry room? Any arguments as to that? There's certainly no evidence of knowledge of the PCP by the laundry room. It is virtually hidden. The officer said that she did not see it even as she walked up. It's in a container that does not reveal itself as something that's immediately incriminating. It's the same with the PCP in the living room, which is in a very small vial, hidden in a vase or behind a vase. They didn't need that vial in the living room. I get your argument on the vial in the living room, but they didn't need that one to support it. That one wouldn't even have supported the conviction, given the amount. So the real focus for the conviction has to be the bottle that was by the laundry room. I respectfully disagree. I believe the expert said that you could use the smaller vials to dip cigarettes one at a time, and that that could be a distribution quantity. The quantity in the vial, was the quantity in the vial sufficient to support distribution just by itself? I believe it was a one-ounce vial. Yes, I believe that's what the expert explained. It's true that the quantity down in the basement was larger, but there's nothing linking him to PCP at all. What do you make of the so-called drug paraphernalia in the bedroom? I think the link that they're resting on is drug paraphernalia in plain view in an area for which he has domain, and gun in view in an area for which he has domain, and both drug paraphernalia signals drugs, and that guns and drugs go together. First, to address the drug paraphernalia, the government did not, there's not testimony that that is drug paraphernalia. That comes from Government Exhibit 73, which is a picture of GLAD bags, and they are not Ziploc bags. They are open bags, which are different. I realize I'm speaking from my general knowledge, but... You're liquid PCP in a fold-over bag. That's a question. And there's one gallon bag. There's also a silver device that the government says is a scale, but again, there was not testimony about this specific, these specific items. Are you aware of... We vigorously dispute that they are drug paraphernalia, but they are certainly not PCP drug paraphernalia. So they, again, don't link to the PCP outside of the bedroom. The PCP around the corner. Now, you mentioned a couple times you weren't allowed to develop evidence on who else was drug paraphernalia. Can you elaborate for me, because my understanding of the record is that the district court wanted you to specify a time frame, and that whenever you asked a question and then specified a time frame, the relevant time frame, around the year of the search or the months preceding the search, you were allowed to ask the question, and it was only when you didn't specify a time frame that the question was stricken. Am I misunderstanding the record? That's generally correct. We understand it wasn't you personally. Right, sorry. Yes, yes. I understand. I understand the question. The time... First, I'd say the time frame was not a reason to exclude the questions that were excluded. The government asked questions. There's only one time frame in the case, and that's the time frame surrounding the discovery of these items. The defense counsel asked, ma'am, did you ever know any other individuals to have access to your apartment, in other words, and the court cut him off immediately. Now, this is all after the initial objection by the government, and the majority of that objection was that finding out or eliciting testimony from Ms. Jennings about who else was present or who else had access was reverse 404B evidence when it's actually just defense evidence. I mean, it's true. The government prefaced it with, we don't know the time frame. Well, I'd submit that understanding the time, there were questions that were asked where a time frame was not circumscribed around the question, but because the defense was able to identify who they were talking about, they were then able to ask the logical follow-up question, and when was that person there? Defense counsel, with the example that I just gave, wasn't even able to identify people in order to place a time frame around those people. I mean, the court cut off, and that was a sua sponte objection. After this exchange between the government and defense counsel, the initial objection, which I'd submit that time certainly was not relevant. Why do you say time was not relevant? I shouldn't say time wasn't relevant. Time was relevant, but the government put on evidence and emphasized that whoever had the contraband in the house was comfortable in the house, and whether you were comfortable, how you prove comfort in a house is through a pattern. It's through repeated steps. Do you walk to the refrigerator and open it? And that is not as dependent on an exact date, whether it's three days after everyone's arrested or three days before. I don't think the court was that narrow in the time frame. It was just trying to say like the year or within months of this search having happened. Several times defense counsel did start his questioning with a time frame and got into questioning, and this here is an example. So which point? Can you tell me which page you're on? I believe it's 7-9. Sorry, if you'd rather just do it on rebuttal, that's fine. It's up to you. Well, I can tell you. On page 148 and 149, let's be a little more specific. In October 2013, actually let's say between April and October 2013, did Seth Jr. have a key to the It's clear that he's still talking about the same time period, but then less than a page later when he gets to 150. Well, that's because as you go down there, Seth Jr. stopped using the house after 2012. She agrees. That's why. That was a problem. And then we're switching to Seth Sr. before we get the objection that's sustained. All right, Seth Jr. We start at the top of that page. Let's say he was there April, October 2013, and we talk about Seth Jr. He was there until high school. When did he graduate? 2012. And thereafter, did he use the house to do laundry still? Junior, yes. No. So he wasn't there after 2012. And then we start getting the questions about Seth Sr. Right. It's still within the same time context. I would say if time is really that important, then defense counsel should have, it would have been the better practice to begin every question with during the time period in question. But this is in context. There's not confusion about all these different dates and times and something recovered here and something recovered there. There's only one time. So I'd submit that it was an abuse of discretion to limit defense counsel in this way when there was nothing ambiguous, confusing. Time was not even that relevant. And to come back to who feels comfortable in the house, there's no reason that the defense should not have been allowed to show who felt comfortable And there may be somebody who demonstrates the pattern even after the arrest in this case, even after October 13th, demonstrates a pattern of comfort in the house that would undermine the government's theory that the only person who could have had this was Harold Dorman because he was the most comfortable. Well, if there is someone walking around in their underwear the day after the arrest, that person, that would be highly relevant to show that that person was comfortable in the house. So my only point is time is a red herring. Time was not a problem and it was something very, very easily clarified either on redirect, either through an additional question by the court. It was, I'd submit that the reasons, the reason for excluding this, that there was no legitimate reason for excluding this testimony. And we don't even know how defense counsel would have, would have finished the question that the court cut him off without an objection from the government. And in a case such as this, where the evidence is so circumstantial and you have inference built upon inference to show a knowledge and possession where the defendant is not arrested inside the house. Our ability to show circumstances that call into question the circumstantial evidence that the government has presented is crucial. And any alternative hypothetical to guilt could make the difference in this case. And whether it's under a constitutional standard or a simple harmless error standard, there's no fair assurance that limiting cross-examination in this way. I just have one other fact question, if you'll let me jump, and that is the respect to when Mr. Dorman called Ms. Jennings. Yes. During, at some point during the search, is there anything in the record that talks about when during the search that phone call happened? Beginning, middle, end? How do you know? Sorry, there's not anything in the record that explains it. And she was outside the house when she made the phone call, is that correct? I thought I read that. It's not clear. I know at one point she testifies that she had had to wait outside of the house during the search. But during the actual phone call with Mr. Dorman, it's simply not clear. Which really brings up, it's not clear what she knew at the time that she was speaking with Mr. Dorman. It's a very ambiguous statement. Or the way the government has characterized, the way the government characterized it in the grand jury, that she laid him out is an ambiguous statement. And we don't know what she laid him out for, what she knew, what she said. And his response, my sorry, is also very ambiguous. Because we don't know what he's sorry about. Sorry is generally an expression of remorse or sympathy for someone else's distress. It's not, I am responsible for everything that the police recovered in the house, which is how the government would have you characterize it. When Ms. Jennings is actually asked what she thinks he means, she provides an explanation that she thinks he is sorry that she is upset. And he wants her to calm down. That's perfectly reasonable and logical. And we are past the point of inference into pure speculation that this is an admission for everything that's in the house. All right. Let's hear from the government. Good morning. May it please the Court. James Ewing for the United States. The government presented a strong case at this trial, and none of the appellant's claims warrant reversal. Looking at the appellant's sufficiency claim first, three lines of evidence point to the fact that First, as the Court's questions pointed out, appellant was living in that basement bedroom. Second, the location of the contraband in the basement bedroom showed that appellant had the substantial voice, vis-a-vis the other occupants or people who had access to the house, to that contraband. And third, if there was any doubt... Given the locational distinctions between the guns and the drugs, it would be helpful if you would say instead of contraband, which item you're talking about. Specifically, Your Honor, as to the locations of the gun and the main stash of the drugs that was in the basement, is what I'm referring to now. And third, if there were any doubt about whether appellant had constructive possession over those drugs, his statements to his own mother cleared up that doubt. Looking first at the evidence... I just want to be clear. Those are the three prongs that you're relying on. Well, those are kind of the three groups of evidence that we believe show that he had... You said you had a strong case, so we're trying to separate out each item. I thought that's what Judge Pillard's... Yes, Your Honor. Well, we do believe the evidence was strong as to all the evidence in the house. If I can walk through it kind of one at a time, looking at the, first of all, the gun that was found underneath the mattress in the downstairs bedroom. That bedroom was appellant's bedroom. There was a picture of him in his high school football uniform on the wall. His shoes were underneath the bed. He had court paperwork from his Pennsylvania case was right next to the bed with his name on it. That was his bedroom. His mother said that it was his home base, that he was the only person who lived down there, who stayed down there when she was home. So that's premise one. That was his bedroom. The evidence was very strong of that. You've got a gun underneath, between the mattress and the box springs, of the only bed in the bedroom. The handle is sticking out. So the evidence he's constructively possessing that gun is very strong. We look at cases like Morris and Jenkins and others that say that a person... is able to infer that people constructively possess the items in their home or in their residence. Now, we had said that... You referred to Morris and Jenkins and which was the other one? Those are the only two that I cited for those purposes, Your Honor. We would concede that other people had both lived in this house and had access to the house, but no one else lived in the basement bedroom. But we're not relying simply on the fact that that was his room. Obviously, for example, the main stash of PCP wasn't in the bedroom. But if you look at Supplemental Appendix page 3, which is a diagram of the downstairs basement, and look at where that PCP was located, it was in the laundry room right on the other side of the wall from Appellant's bed. Was this introduced in evidence at the trial? Yes, Your Honor, it was. I forget the government exhibit, but the diagrams at pages 1, 2, and 3 were the three levels of the house, and those were introduced at trial. The PCP was as close as it could possibly be to Appellant's bed and his bedroom without being in his bedroom. Well, the argument was he had to go out two doors before he could get to it. I agree with that, Your Honor. He's got to go out his bedroom. I mean, it's a round granite. He can't reach through the wall. But I guess my point is that there are reasons why he wouldn't want this PCP in his bedroom. We have testimony from the FBI agent that PCP, and particularly this particular PCP, had a very strong chemical smell. Right, and lots of people used the washer. Other people used the washing machine. That's correct, Your Honor. But, you know, it makes sense that he would have this main stash of the PCP that he doesn't want to have in his bedroom because it's got this strong chemical odor. But he wants it close to him. He wants to be able to know when people are coming and going out of that laundry room. He wants to have close access to it where he can hear. It's not stashed, for example. I don't know where all that's coming from, right? He wouldn't even know how often he was staying in that room. So that seems to be a bit of an evidentiary list. Well, Your Honor, the evidence was that he was staying in the bedroom, you mean, Your Honor? You're acting like he was there guarding it all by the thing, and there isn't evidence that he was in that room day and night listening for anybody to come near his PCP. You're saying when you say that room, you're referring to his bedroom? Well, I mean, I agree there's not evidence that he was in there day and night, but there is evidence. Well, you're just telling us the whole story about it. It was right there. We wanted to make sure nobody would come get to it, and he could monitor whoever was coming to it. But there isn't any evidence that he was in the bedroom or even in the house with the frequency to monitor day in, day out who was going to the laundry room, was there? I mean, I would respectfully disagree with that, Your Honor. Okay, what evidence? Well, his mother said that the majority of his clothes were down there. His shoes are there. The car is parked right outside. That day? That day. Or the day before, right? Yes. And he was there the night before. I mean, the TV is still turned on. So this is not a situation where this is some— The TV in his bedroom? Yes, Your Honor. Turned on the ESPN. And so this is not some situation where this is like an abandoned bedroom. No, I get that. I don't think there's any question that he was there the night before. We don't know how long, but maybe a jury could reasonably infer overnight. I was just getting to your point about he was a guard dog for this PCP, but he wasn't there that day. Well, in the sense of it kind of—the location of the PCP makes sense. I mean, it's as close as it can possibly be to his bed, to his bedroom, without being in his actual room. Other than that bottle of PCP, what evidence was there in the record that connected him to having anything to do with the drug PCP? He was being investigated for jewelry theft. Right. There's nothing in his bedroom that was remotely related to PCP, possession, manufacturing, distribution. Well, upstairs, Your Honor, there were 50 empty vials, empty one-ounce flash vials. Upstairs? Yes, Your Honor. Yeah. Everybody was upstairs. Well, but that also makes sense. I mean, the— Is there anything specifically as to him that wouldn't apply equally to everybody else who was in the house regarding PCP? Well, I mean, we would argue that the location of the PCP downstairs— That's back to the right next to the wall. Right. I mean, that coupled with—and again, I mean, we would argue that that fact, it flows from that upstairs. Dominion and control. Right, yes. That's exactly right, Your Honor. When everybody and his mother-in-law is using the laundry room. And the upstairs. I mean, that's a funny place to put it. Well, just because they're using the laundry room doesn't necessarily mean that they are, you know, accessing that. If you look at the pictures— It doesn't mean they're accessing what? The PCP. The laundry room? It doesn't mean that they're accessing the PCP. No, no, no, no, no. But the government has a very heavy burden on constructive possession. And it's a heavy burden when you have a lot of people in the same house. So it's not in his bedroom. You want us to say this is his exclusive bedroom, and you point to the evidence suggesting that. So he's put it in a common room. That's correct, Your Honor. Right around the corner from his bedroom, the next bedroom. If he goes out, two doors. And that's enough for dominion and control? Well, I guess to my third—the third part of my argument, which is his statements to his mother over the phone, that was discussed with my opposing counsel a little bit. She's furious that the police are in there because she knows what's going on upstairs. And she doesn't want to get in trouble and thrown out of the house like that lady we read about in the newspaper whose son was doing drugs in the house. Now, this son is a jewel thief. What is the connection to PCP? An alleged jewel thief. An alleged jewel thief. Convicted once, maybe. Sorry. I have absolutely no doubt that his mother was furious. But with respect to my friend, his arguments regarding that grand jury testimony, that's at pages 32 through 38 of the supplemental appendix, are a good closing argument about what that grand jury testimony meant. But that's not the standard of review at this case. At this point, it's the light most favorable to the government. Could a reasonable jury find beyond a reasonable doubt when we view the evidence in the light most favorable to the government? Correct. So there is that. I mean, yes, we're doing it very differentially toward the verdict and toward the government, but there is the overlay standard of proof that's quite high. Well, my point, though, I'm sorry, Your Honor. Elements of the offense. Correct. But I guess my point is if you read that grand jury testimony, a reasonable reading of that, and we would submit the most reasonable reading of that grand jury testimony is he's saying he's sorry for the guns and drugs that were found in the house. She doesn't say that. She doesn't say that he said that. I mean, that's the problem you have there. You want it as a confession to everything that the police found in the house. We don't even know what she said to him. Yeah. I mean, I'm smiling because I've worked so hard with my own children to say you need to say you're sorry when someone's upset at you. It is not an admission of guilt. It is a recognition of the person's distress, and you go from there. And, I mean, it's just there's a lot of ambiguity around the word I'm sorry, but I think the bigger problem with this record from your perspective is we don't know what she said to him. She could have said, the police are up and down the house. They're pulling stuff out. This doesn't look good. This is going to get me in a lot of trouble. I'm really angry. She could have said that, and he said, Mom, I'm sorry. Or she could have said, and there's drugs, and there's guns, and, you know, you are in trouble with the law, and you did this. And he doesn't deny, and he says, I'm sorry. And, obviously, the latter scenario is more what you're characterizing. I'm not clear the record supports that. Two responses, Your Honor. First, the word everything was used in that grand jury transcript. The question that was asked of her in the grand jury was, did you kind of lay him out for everything that was found in the house? And she said, of course I did. Can I back up there? I'm very confused about something. She was outside the house during the search. We have no evidence at one point. Am I right that there's no evidence as to what point in the search, beginning, middle, and this call happened? Is there any evidence? Other than the context of the grand jury transcript. What is it? Tell me the context. Is the timing of this phone call with respect to the search. Well, in the sense of the question posed to her was, did you lay him out for everything that was found in the house? If nothing's been found yet, her answer would have been no. Are the police in the habit of reporting to people what they're finding as they find it? I don't know. No, there's no evidence whatsoever that the police went and said, okay, we finished our search. Here's everything we found. And then she gets the call. Well, I mean, I guess her answer. I'd be surprised if that's the police practice, to be honest. The evidence of that is her response in the grand jury. I mean, she could have said, you know, they didn't really tell me what they found. I'm just upset because there's police in the house. And there's a little snippet below that initial kind of response, and I believe this is on page 38 of the supplemental appendix, the last page of the grand jury transcript, where after she says, yeah, I laid him out for everything, everything that was found in the house. We only got these little snippets here from the grand jury. We don't have the full. I believe that's what was admitted into evidence. That's why. I believe it's the last page, page 38. And then he said, the grand juror prosecutor asked her, well, did he say anything about the things that were found in the house? And she says, no. She doesn't say, you know, yeah, he said they were Seth Jr.'s. Was he arrested before the search or after the search? He was arrested. In fact, he was already arrested. He was arrested on an unrelated matter up in Maryland, so he was arrested while the search was going on. So, you know, he just, and then she's asking again, he just said, I'm sorry, and the answer is yes. So what's he apologizing for? I mean, he's apologizing for what? He's been arrested for what? I believe he was arrested on an unrelated Maryland warrant. For? I don't remember, Your Honor. I don't believe that's in the record. PCP? I think it was. I want to say no. I believe it was a parole violation or something along those lines in Maryland. Did he say anything about the stuff that was found there? No. The only thing, did he say he was sorry? Yes. So what's that? He's just been arrested. He's calling mom. I think he better say sorry. But that exchange doesn't make any sense. I mean, the most logical. And all the items that are down in the basement are his items. Is that correct? Most of them. Right. And she said that she identified his shoes that were down there, his clothes. She said that was his home base. So, you know, views that particularly. So he's living in the basement. He has a substantial voice. That was your phrase, which is different from dominion and control. And the statement to his mother. It makes your strong case for all the contraband. Yes, Your Honor. With the substantial voice piece, we're looking at really cases like Gomez and Staten that talk about where you live there, but other people also live there, too. So that's the concept that we're looking at there. In your brief, you had raised the point that there was a gun, and so if there's guns, we can assume drugs. And you're not mentioning that here. Are you abandoning that? We are relying on that as well, Your Honor. In cases like McClendon and Booker, this court has said guns and drugs go together. Guns are essentially paraphernalia of a drug distribution. Really? Absolutely. I am shocked. That's the position of the United States government? That if someone has a gun, which they have a Second Amendment right to do, we can infer that they have drugs in another room? That's the position of the government? We're not saying that that's all you need, but this court has said over and over. But it's evidence. It's relevant evidence. Absolutely. I get when you've got drugs, maybe you can tie them to the gun, but I'm shocked. Possessing a gun is relevant evidence that you also possess drugs in another room. Drug dealers can't call the police when they get robbed. We understand the implication that if you have contraband, that that raises an inference of varying strength depending on the rest of the circumstances that you might have guns to protect yourself. I think the difficulty that Judge Millett is pointing out is, you know, a third of the people in this country own guns, and does that mean that when any contraband is found in their home that is shared with other people, that the existence of the gun makes it more likely that that contraband is theirs, as distinct from a non-gun owner home where contraband is found? And I guess the question is we're sort of trying to probe the logic of that. Right. I think you're right that there's some suggestion in the case law that the inference runs both ways. But as a logical matter, it doesn't actually seem to be symmetrical. Well, I believe it's the Alexander case that says that, Alexander is the case that says, you know, in a joint occupancy situation you need, I think it says, something more. And one of the something mores that Alexander cites to is connection to a gun. And so that, I think that if you look at McClendon, you look at Booker, and there are several cases that we've cited in our brief, it does kind of go both ways. Alexander was about drugs or was just about the possession of the gun that was found near him? I believe it was about the possession of drugs and what you need something more to go to that. But I guess just looking at this Court's cases, we do believe that it flows both ways. I know. Most of our cases are dealing with drug conspiracies. And that's where this expert testimony comes in. And now you're telling us it morphs over into anybody who has a gun and we find some contraband in your home. You just link it to criminal activity. I mean, I guess starting point, this was anywhere between $4,000 and $8,000, depending on how you count it, of PCP in the laundry room. And so the point is that drug dealers cannot call the police when they get robbed, so they arm themselves to protect their drug stash. Neither do jewelry thieves. So the reason for the warrant in this case, they suspect this individual of having robbed a jewelry store. And it just seems, you know, so do people who are intruders, people who live in dangerous neighborhoods. So the notion that there is enough of a logical inference to use that, it's just a little harder to run it the other way. Well, let me, I just want to make clear, we're not relying on that. We just see that as a… Well, you argued it and briefed it. Right, but we're just seeing it as… Is it relevant evidence or isn't? We do believe it's relevant, but it's part of the overall picture. But I thought that's why you were focusing on the three items you did. Yeah. And you didn't mention the drugs and guns. Well, it wasn't my intention to leave that out. I mean, we do stand by that, and this Court has said that multiple times. All right, anything more? I would just… On this cross-examination? Yes, Your Honor, if I just may note that briefly. Mm-hmm. All the action in the Confrontation Clause aspect of Appellant's claim takes place in about eight or nine pages from page 147 to 155 of the July 9 transcript. And as Judge Mollett's questions pointed out, this was a situation where the only thing that the district court was asking for was a time frame. There was never anything that was… The district court did not preclude Appellant from asking any questions that were pegged to a particular time frame. And this is the perfect colloquy on pages 154 and 155 point that up. Question, ma'am, if you know, did you ever know Mr. Dorman to have visitors there at the house? Objection. District court says, you have to be more specific than that. Question, between April and October of 2013, and there's an objection again, and that was overruled. And the district court said, no, no, you can answer that. Now, the April to October time frame of 2013, Appellant's trial counsel came up with that himself, but that time frame makes sense because it's the six or seven months leading up to the search warrant. So there was never anything that was precluded that… I guess I'm a little on page 150 of the transcript. We have the stuff about Seth Jr., Seth Sr. And then Mr. McDaniel tries a new line. Ma'am, did you ever know any other individuals to have access to your apartment? In other words, did. Without an objection, we get sustained. Yeah, I don't know the context for that, Your Honor. I mean, I think that goes… Well, the context is page 150, and it's after those other things, and all he says is, did you know any other individuals to have access to your apartment? Pretty critical to the defense in this case, pretty critical defense evidence. In other words, did. So we haven't even finished asking the question. We don't know that it's not going to have a time frame that would be specific. And we get sustained from the district court. How is that possibly justifiable, given how critical this was, this kind of evidence was to the defense case? Well, because, Your Honor, they had a bench conference on this where the district court, and that was a couple, I believe it was page 147. A couple pages before, yeah. Yeah, and the district court's saying, you know, you're asking very vague questions. You have to be more specific, or I'm going to tell the jury to disagree. Have other people had access to your apartment? When? So your wish is to preserve that. They really need to come back and say, given that counsel should have known that the timeliness, vagueness, the vagueness of the timing was what was a concern, counsel should have come back and said, excuse me, but in the time period between April and October, did any other people? And that would have teed it up, in your view. Well, right, Your Honor, and that would have been allowed. I mean, and that was the – it's obvious from the record that that was the district court's concern was that, you know, was it access to the house 30 years ago, or was it access to the house last week when it's waiting? How do you respond to the notion that the timing has been set and it's kind of a series of questions pursuing it? Oh, you mean leading up to that? Yeah. Well, I mean, I guess we would go back to the point where that the district court never precluded any question that had a time frame attached to it. But he didn't get to finish the question. Counsel didn't get to finish the question. That's the problem. There was no objection. I guess he was free to ask the – I understand and Pelham's counsel said, you know, well, he should have asked the question putting the time frame up front. But suppose he was putting the time frame at the end of the sentence? I suppose that's possible, Your Honor, but there was nothing precluding a Pelham's counsel from asking that very same question with the time frame in the front. Just to clarify. Well, we just had sustained, sustained, so one can imagine. Not wanting to alienate the jury. Yes. Not going for the third strike. Well, okay, but then just a few pages later he asked a time frame question. He gets another objection, and that's overruled. So now he knows, okay, now I know that this is what the district court's concern is. And Appellant did a good job of getting a lot of people into this house. I mean, we've got Harold Sr. – these are people that had keys. Harold Sr., Seth Sr., Seth Jr., Mr. Hill, Mom. But he's trying to show it's like Grand Central Station. Well, he did. He got it. He did show. So on the aspect, on the colloquy in pages 154 and 155 where he's asking about friends or guests, the ultimate answer to that was yes, he had guests. How many? When? I mean, so that's a pretty favorable response. So he got to get a lot of evidence in that there were an awful lot of people moving through this house. He was not precluded from putting evidence on that other people had access to the house. Notwithstanding that, we think that the evidence was sufficient that it was Appellant who had constructive possession of the guns and drugs in the house. Mr. Ewing, it's not your position that that Tropicana bottle in the laundry room was in plain view, is it? No, Your Honor. Do you have another case other than Alexander which didn't involve the question about guns implying drug possession? There's just no drug charge in that case. I wonder if you have another case with the vector going that way from the guns to the drugs. I believe, I think Booker was going in the other direction if I'm remembering it correctly. Booker was going from the drug to the gun. I don't remember which way that it was flowing in McClendon, but in McClendon this court did say guns are tools of the drug trade. Right, right. I can't point you to a specific case where the evidence is flowing the other way. And you understand the difficulty? Well, I understand, but I think that logically that it would flow in both directions, particularly when you've got a stash of PCP of this amount. Because I don't get the logic. The logic starts from I'm possessing something illegal and of value that I have to protect on my own. That's why we have the, as Judge Bowes said, the vector going toward the gun. Right. But I'm possessing a gun. But why? Why are you possessing a gun? Because you've got $8,000 worth of PCP right now. Lots of people have lawful reasons that people do. Lots of people have lawful reasons for having guns. Sure. I mean, we're not saying that people don't possess guns lawfully. We're saying that it makes... There's no starting point for an inference of criminality just because you have a gun. Would you agree with that? Well, I guess all we're saying is that... I guess the answer to that, it depends. I mean, we're saying that this is a gun that you own lawfully and is registered and all that. I mean, if it's in close proximity to a large stash of drugs, then yes, that could go to whether you were also constructively possessing those drugs. All right. Anything further? No, Your Honor. We would ask that this Court affirm the judgment of the District Court. Thank you. Thank you. Counsel for Appellate, we'll give you a couple minutes. I'd just like to say with regard to... I understand that historically there are lots of cases that say there's a relationship between guns and drugs. But the rationale for finding that relationship is just as the government said, that the gun is to protect the drugs because the drugs are valuable and the person protecting them doesn't have the benefit of the law to call. One big problem that the government has in this case is that Harold Dorman is arrested an hour and a half before the search, meaning or suggesting that neither the gun nor the drugs are his because nothing's being protected. It's left in the house alone. There's no greater likelihood that someone's going to come and try to rob him only when he's there. The greater likelihood is that the house would be burglarized when the person protecting the stuff is not there. But the fact that Mr. Dorman is not present suggests someone else was. The government said that the TV was still on. The rationale just does not hold up that the gun in the bedroom... And remember, we're only inferring that Mr. Dorman possessed the gun because of his primary relationship with the bedroom. Others still do have access to the bedroom, and that's why that point is very important. Do we know where he was when he was arrested? He was in Maryland, and he was arrested for a robbery in Maryland. And this house is in D.C.? This house is in D.C. It's not on the record whether he had a gun on him when he was arrested in Maryland. It is not in the record. There's no indication that he had a gun in Maryland. One thing I was curious about is that on the stairs going down to the laundry room was a box that said Glock, and I think it was a Glock gun that was found in his bedroom. Is that correct? No. I think the Glock was the one on the sofa. The sofa one? Okay. I am not sure. I'm not sure, but the bedroom gun was not a Glock. Okay, all right. So then there was evidence of the other one. We know there was one gun, whatever it was, found under the sofa, and then there was a box. In the common areas, there were evidence of that. I remember that the officer testified that the box did not match anything in the house. Okay. So I can't tell you whether it was a Glock by a certain manufacturer or whether it was exact. The government asked with regard to the statement, what's Mr. Dorman apologizing for? And that's the problem. That's the problem with Moss Sari. The government, there's no answer to that. We don't know what he's apologizing for. So that ambiguity leaves the statement proving nothing for the government. I'd also note- Do the police usually tell the person whose house is being searched everything they found at the end? In your experience? The practice that I've seen, they don't. I've had cases where- Let me ask you that when they execute a search warrant. I'm sorry? When the police execute a search warrant- Yes. Do they give the owner a list of what's being taken? They are supposed to. Yeah. What I was about to say is, in practice, I have not had a client receive that list before. He's not the owner? I mean, this client? I've not had a case where we got the list from any place other than the government in discovery. That's all I can say. But with regard to- Again, with regard to the statement, to the extent that Ms. Jennings' statement is ambiguous, the government in the grand jury, one, remember this is a leading statement, and they could have asked other questions as to what she said. At trial, when she was asked very close to what she said, she said, I said I was upset. So that's the closest we know, but it's still ambiguous, and I'd ask the court to reject that as an admission for everything in the house. All right. Thank you. We'll take the case under advisement.
judges: Rogers, Millett, Pillard